No. 42,044

Mrs. Donald W. Faulkner, widow; and Donnealia Faulkner, Nancy Faulkner and Diane Faulkner, minor dependents (Donald W. Faulkner, dec.), *Appellees*, v. Yellow Transit Freight Lines, Inc., and Truck Insurance Exchange, *Appellants*.

(359 P. 2d 833)

Opinion filed March 4, 1961.

*Paul L. Wilbert*, of Pittsburg, argued the cause, and *Randall D. Palmer* and *E. Carter Botkin*, both of Pittsburg, were with him on the brief for the appellants.

*William P. Meek*, of Baxter Springs, argued the cause, and *Joe L. Henbest*, of Columbus, was with him on the brief for the appellees.

The opinion of the court was delivered by

Price, J.: This is a workmen's compensation case.

During the course of his employment the workman, a truck driver, received injuries in a tornado from which he died a few days later.

The commissioner, and, on appeal, the district court, made an award of death benefits for his widow and three minor children. The employer and its insurance carrier have appealed.

The sole question in the case is whether the workman's injuries arose *out of* his employment, as is required by G. S. 1949, 44-501, which provides in part:

"If in any employment to which this act applies, personal injury by accident arising out of and in the course of employment is caused to a workman, his employer shall, subject as hereinafter mentioned, be liable to pay compensation to the workman in accordance with the provisions of this act. . . ."

Although the workman is deceased, we will, for the sake of convenience, refer to him as claimant.

The facts, most of which were testified to by one Leland Polly, a fellow truck driver, and who also received injuries in the tornado, are not in dispute.

Claimant, Donald W. Faulkner, lived at Baxter Springs, Kansas, with his wife and three minor children. He was a truck driver for Yellow Transit Freight Lines, Inc., and on April 2, 1957, his job was to drive a company truck from Baxter Springs to Dallas, Texas. Polly, a fellow driver for the same company, was driving a company truck just ahead of claimant. At a "truck stop" a little south of Atoka, Oklahoma, Polly stopped and had a conversation with a truck driver for another company. He told Polly that he had heard over his radio that a tornado had struck Dallas and was headed north toward Durant, Oklahoma, and that the weather bureau office estimated it would hit Durant in about an hour. At the time of this conversation the sun was shining at Atoka and there were just a few scattered clouds. Claimant pulled into this truck stop just as Polly was leaving. They waved at each other but had no conversation. Polly and claimant drove on toward Durant, which is approximately thirty-one miles south of Atoka. When they had covered about half of the distance it became very cloudy and windy and rain came down in torrents intermittently.

Both drivers arrived in Durant, with Polly's truck in the lead. On Ninth Street in Durant a small passenger car had halted for a stop light. Polly's truck, due possibly to wet brakes or some mechanical defect, bumped into the rear of this car, causing some damage to it. At the time in question it was between 4:30 and 5:00 o'clock P. M.

The company policy of respondent trucking firm was that whenever its drivers were in any sort of traffic accident they were to

stop and render aid and assistance to other persons involved, to get the names of witnesses, and to report all accidents. At the time of this accident claimant was right behind Polly and observed it. He and Polly moved their trucks down the street about a block so as not to block traffic, and then went back to help push the passenger car off of the street into a nearby gasoline service station. At the time in question the weather was very threatening and it was raining hard, off and on. After discussing the matter with the passengers in the car, Polly used the telephone at the filling station to call the Durant police department to report the accident. The police told him to "wait at the scene of the accident and they would be right out." The people who were riding in the passenger car, the filling station attendant, and claimant, were present in the filling station at the time. Immediately after calling the police Polly called the truck line's terminal at Dallas for instructions. He was told to call the terminal manager at Sherman, Texas, a man by the name of Johnson. He then called Johnson and told him that he had been involved in a minor traffic accident in Durant. He also told Johnson that claimant was with him there at the filling station, and Johnson said for them to remain there and that he, Johnson, would "be up shortly." In connection with this conversation with Johnson, and other events occurring right at the time, the following is quoted from Polly's testimony:

"Q. What else did you discuss in the conversation?

"A. I asked Mr. Johnson what he wanted me to do, and he told me to stay there, and he asked me if there was anybody with me, and I says 'Yes,' and he asked me who, and I says 'Don Faulkner was with me,' and he says 'Well, have him stay there too,' and I told him, I says 'It is very stormy up here,' and he says 'Well,' he says, 'there were tornado reports out,' he guessed 'about everywhere, storm warnings,' and Mr. Faulkner was standing in the south end of the station and the telephone was in the north end of the station, and he turned around from this window—he was watching the wind—and he just said 'Are you talking to Johnson?' and I says 'Yes,' and he says 'Ask him if he wants me to stay here,' and I says 'Faulkner wants to know if you want to have him to stay here.'

"A. . . . And he said 'I would like to get on down the road,' or 'I like to get out of here to our run.' The words he used, he said 'I would like to get out of here,' and I guess he could see more of the clouds and weather than I could. I was busy on the telephone, and Mr. Johnson says in reply to the question whether he was to leave or not, he says 'Tell him to stay there and I will be up there in a few minutes.'

"Q. About how far was Sherman, Texas, from Durant, Oklahoma?

"A. From our point where our terminal is it would be approximately 23 or 25 miles.

"Q. During the time you were talking to him did you give him the location of the place where you were?

"A. Yes, I told him we were at this APCO station on 9th street.

"Q. Did Mr. Johnson tell you to remain any place?

"A. Yes, he said to remain at that station at the scene of the accident.

"Q. Was there anything further you said to him concerning the police report?

"A. Well, he asked me if I had contacted the police and I told him I had.

"Q. What did you tell him about that?

"A. I told him they said they would be right out to investigate it.

"Q. Now then did he tell you about how long it would be before he would be there?

"A. He just said 'A little bit, possibly wouldn't take very long to drive it.' He said 'I will be there in a little bit.'

"Q. After you had this telephone conversation and hung up the phone was there any further conversation there in the filling station?

"A. Well, I hung up after talking to Mr. Johnson. I told Mr. Johnson the police had never come by yet and I told him that I believed I would call them again to see if they were coming out and see if there was any delay about anything.

"Q. What did you next then do?

"A. Well, I put another dime in the telephone to call the police again. I put a dime in, started to dial their number and Faulkner called out and said 'We had better duck.' He said 'Here it comes,' and there was no doubt in anybody's mind by what he meant by using the word 'tornado,' and I just kind of turned around from the telephone, and this fellow watching the station was standing over by the front door and he started to shut it and I says 'No, leave the door open—everybody lie down' and Mr. Faulkner and Mr. and Mrs. Dean laid down toward the south side of the building by the door and the man running the station laid down by the door and I was standing in this position, and about the time I got the word 'down' out that was it, the storm struck.

"Q. Then what happened?

"A. Well, all that I can remember is that—I don't remember the sound of the storm or anything, but I do remember just after it was over everything was so quiet."

The filling station was demolished, its attendant was killed outright, Polly was injured, and claimant received injuries from which he died a few days later. The city of Durant suffered extensive damage to buildings and property running into thousands and thousands of dollars. In all, there were three deaths.

In addition to the testimony of Polly, there was considerable evidence consisting of the testimony of the state climatologist for the United States Weather Bureau at Oklahoma City, and the assistant professor of meteorology at Oklahoma State University, concerning the frequency of tornadoes in the Texas-Oklahoma-Kansas-Arkansas and Missouri area. It will not be detailed, and it

is sufficient to say that it bears out what is commonly known to everyone in the area in question—that is, at certain times of the year severe storms and tornadoes do occur in that part of the country.

The reasoning of the commissioner in making the award is contained in his findings, and we quote pertinent portions thereof:

"The evidence is undisputed that the deceased suffered an accidental injury when the tornado struck the service station, in which he was standing, and demolished it. Since he was on regular duty for this employer when the storm struck it must also be said, without question, that the accident occurred in the course of the employment. This leaves the prime issue as to whether or not the accident 'arose out' of the employment. The established rule is that an injury sustained as a result of vis-major, such as a tornado, does not arise out of the employment unless the employment in some specific way reasonably can be said to have increased the workman's hazard, to such elements, (*Rush vs. Empire Oil & Refining Company,* 140 Kansas 198). The issue, therefore, is: Did the employment subject him to a greater risk or hazard than that to which he otherwise would have been exposed, (*Taber vs. Tole Landscape Company,* 181 Kansas 616, at 621.)

"His supervisor, the terminal manager at Sherman, Texas, gave him specific instructions to stay at the site at Durant, Oklahoma, where he was injured until he, the terminal manager, could drive to that point from Sherman, Texas, a distance slightly exceeding 23 miles, even though the supervisor was informed of the tornado warnings for Durant. The regular risks of the employment as to storms were augmented by these specific instructions from the employer. In other words, the workman's death would not have occurred if the employee had not been required, in the performance of the duties of the employer, to remain at the particular site, at the particular time under the particular conditions and environment. One, therefore, must conclude that the deceased workman at the time and place in question exposed himself to a greater danger than if he had not been on the job and that the death of the deceased workman 'arose out' of his employment."

On appeal, the commissioner's findings and award were approved, affirmed and adopted by the district court—hence this appeal.

Both parties cite the case of *Rush v. Empire Oil & Refining Co.,* 140 Kan. 198, 34 P. 2d 542, mentioned by the commissioner in his findings.

Briefly, the facts in that case were that respondent company was a producer from leases and had an extensive business in Butler county, and in the conduct of its business had laid out, built and maintained the town of Oil Hill. In addition to offices, warehouses, shops, yards and barns of respondent, the town consisted of several hundred dwelling houses owned by it, nearly all of which were occupied by its employees and their families. Streets and alleys

had been laid out. The claimant in that case worked for respondent in the care of its horse barns, and also in the department that looked after the cleaning of alleys and sanitation of the town. He was provided a team and wagon and he followed a regular route, going through the alleys and about town gathering up waste paper and trash. While going about his work on the afternoon in question a severe rain and windstorm came up from the south. For protection to himself and his team, he led the team to the north side of a garage constructed of heavy timbers, located next to the alley. While standing there holding the team the storm blew the garage over onto or against him with the result he was severely injured. The storm also blew down about fifty oil derricks in the adjoining oil fields and a portion of the porch roof of a warehouse in the town, but did no other damage.

The workman's claim for compensation was allowed by the district court and the respondent company appealed. The question presented was the same as here—that is, did the accidental injuries arise *out of* the employment? In holding that they did not, and in reversing the court below, it was said:

"Did the accident which caused plaintiff's injury arise 'out of' his employment? Even when other conditions exist authorizing the award of compensation, it is essential that the accident which causes injury to the employee arise 'out of' and 'in the course of' his employment. . . . These terms are used in the conjunctive. Both conditions must exist. . . . The terms are not to be confused. They mean separate things. 'In the course of' employment simply means while the employment was in progress. . . . Those words point to the time, place and circumstances under which the accident took place. . . . Applying these authorities to the accident which caused claimant's injury in this case, there is no difficulty in saying that the accident arose 'in the course of' his employment. But that is not enough. It is essential also that it arose 'out of' the employment. These words point to the cause or origin of the accident . . ., and require that some causal connection exist between the accidental injury and the employment. . . . It never was the purpose of the compensation act that the employer should in all respects be an insurer of the employee, but he is such insurer only for those accidental injuries caused or produced in some way by the employment. The statute uses a rather broad term in the expression 'out of' the employment, thereby indicating that the statute should have a liberal interpretation to accomplish its purpose . . ., but this does not mean that the act should be construed to include injuries which clearly did not arise out of the employment. . . .

"When the injury occurs from the elements, as from lightning, cyclone, or the like, the majority of the cases hold, and the better reasoning is, that under

statutes like ours . . ., which fix the liability only when the accident arises out of and in the course of the employment, there is no liability unless the employment in some specific way reasonably can be said to have increased the workman's hazard to such element. . . . While the cases cited in these annotations disclose some divergence of views not readily reconciled, what we regard as the better reasoned cases accord with the views of this court, quite consistently maintained, as shown by the decisions previously cited herein to the effect that unless some causal connection is shown between the employment and the injury caused by the elements there can be no recovery.

"Where a workman, while performing the ordinary duties of his employment, observes a storm approaching and seeks shelter in or near a building which is damaged or destroyed by the storm, and the workman is injured thereby, he is not entitled to compensation in the absence of a showing that his situation was more hazardous because of his employment than it would have been otherwise. . . .

"In this case there was no finding, nor was there any evidence to the effect that storms were more likely to occur or were likely to be more serious at the place where this garage was situated than elsewhere, . . .

"Our attention is directed to the fact that the trial court held the accident arose out of and in the course of the employment. But this could be only a conclusion of law based upon facts found. We have previously stated the facts found almost in the language used by the trial court, and there is nothing in them, or in the evidence, tending to show that the storm, and the fact that the claimant sought shelter from the storm, was in any way caused by his employment, or that his situation in those respects differed from that of any other person who might have been in the locality at the time." (pp. 200, 201, 202.)

Both parties also cite the case of *Taber v. Tole Landscape Co.*, 181 Kan. 616, 313 P. 2d 290, also mentioned by the commissioner in his findings.

In that case the workman was engaged in trimming trees on an extremely hot day. Much of his work was being performed in the direct sunlight. Shortly after quitting work he suffered what was diagnosed as a "heatstroke." Both the commissioner and the trial court held that he was entitled to compensation. The award was upheld by this court. In the course of the opinion the general rules relating to injuries resulting from exposure to the elements, as set forth in the Rush case, above, were cited and adhered to, but it was further held that under the particular facts of the case it was shown that claimant's work in fact exposed him to a greater danger than if he had not been working at all, that is, his employment subjected him to a greater hazard or risk than that to which he otherwise would have been exposed, and although the risk was common to all who were exposed to the heat on the day in question, the

true test in such a case is whether the employment exposed the employee to the risk.

Needless to say, in the case now before us, respondents rely upon the Rush case—and claimant seeks to distinguish it. With respect to the Taber case just the opposite is true—for claimant relies on it, whereas respondents seek to distinguish it.

Numerous authorities from other jurisdictions are cited by the parties—in fact, there appears to be no dispute as to the general rule in compensation cases where the workman, during the course of his employment, suffers injury from the elements such as a tornado—that is to say, the injury may be said to have arisen *out of* the employment only when there is apparent to the rational mind, upon consideration of all of the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Stated another way, it must be shown that the workman's situation with respect to the elements was more hazardous because of his employment than it would have been otherwise. Both the Rush and Taber cases so hold.

As so often is the case—the difficulty lies with the application of the rule to the facts of a particular case.

Despite respondents' arguments and contentions concerning the fact that the frequency and paths of tornadoes cannot be predicted with any degree of accuracy; that this tornado brought widespread damage to the city of Durant and killed three people, and that it was a mere coincidence that its full force struck the filling station in question—all of which it is contended did not render claimant's situation any more hazardous because of his employment than it otherwise would have been, and that his employment did not expose him to any greater risk or hazard than that to which other persons in Durant were exposed, we nevertheless believe that the facts here, taken as a whole, distinguish this case from the Rush case, above, and that the judgment must be upheld.

The undisputed facts are that claimant was on a direct run from Baxter Springs to Dallas through so-called "tornado country." Coupled with the physical violence of weather conditions, a number of intervening "human agencies" also participated in the events of the fatal afternoon. Had Polly not been involved in the minor traffic accident in Durant the fair assumption, from the record, is that both he and claimant would have been "on down the highway." Because of the accident claimant stopped to render assist-

ance. Company policy required Polly to report the accident to the police. They told him to "remain at the scene" until they got there. Company policy also made it necessary that the company office be notified. Johnson, the company official at Sherman, knowing of the severe weather conditions and that claimant was there at the filling station with Polly, nevertheless instructed them to remain there until he could drive the short distance to Durant. It was only moments until the tornado struck and demolished the filling station. It is contended by claimant, and we believe correctly so, that under all of the circumstances he thus was placed in a situation, because of his employment, more hazardous than that of the residents of Durant, who, upon observing the approaching storm and having access to radio reports and warnings, were in much better position to seek shelter. Although it undoubtedly is true that the risk and hazard were common to all persons who were exposed to the tornado, the test in such cases is whether the employment exposed the employee to the risk, as was said in the Taber "heatstroke" case, above, and we have little difficulty in agreeing with the trial court that in this case it did.

The judgment is therefore affirmed.